CHEHARDY, Judge.
Mildred Margaret Miller died on May 25, 1976 unmarried and without ascending or descending heirs.
Two years before her death, Miss Miller purchased $4,500 of bearer bonds from Schwegmann Brothers Giant Super Markets.
*544 Approximately four months before her death, Miss Miller closed an existing savings account containing the sum of $7,599.72 and deposited the identical amount in a new account on the same day in the name of Mildred M. Miller or Mrs. Albertha S. Meyer, her cousin. The passbook indicated “payable to either or survivor.”
One day before the death of Miss Miller, Mrs. Meyer withdrew the funds of the joint account. These and the Schwegmann. bonds were in her possession at the time of Miss Miller’s death.
A document referred to as the decedent’s “last will and testament,” which also read “I leave all that I die possesed [sic] of [to] my cousin, Albertha Screen Meyer,” was not admitted to probate because it did not follow any of the allowable forms prescribed by Louisiana law.
All property belonging to Miss Miller, therefore, was distributed according to the laws of intestate successions, and Mrs. Helen M. Regan, another cousin of Miss Miller, was named administratrix.
Mrs. Albertha S. Meyer filed a rule to traverse the inventory filed herein by the administratrix to eliminate the $7,599.72 cash shown thereon. The administratrix answered and reconvened' asking that the inventory be amended to include $4,500 of Schwegmann Brothers Giant Super Markets bonds.
The trial court held that valid inter vivos donations had not been accomplished and, therefore, ordered the cash and bonds to be included in the decedent’s estate.
The issue presented to this court is whether or not the Schwegmann bonds and the cash withdrawn from the joint account are valid inter vivos donations and, therefore, not part of the decedent’s estate but the property, solely, of Mrs. Meyer.
Mrs. Meyer’s testimony relating to the transfer of the homestead account to her name and the decedent’s name and the subsequent request by Miss Miller from her hospital bed the day before her death do not show the clear donative intent essential to a valid donation inter vivos. According to testimony of Mrs. Meyer the transfer of the savings account funds from the name of Mildred Miller to Mildred M. Miller or Alb-ertha S. Meyer took place at the homestead in the presence of Mrs. Meyer. In this regard she testified:
“Well, the date before it happened she had discussed it with Wilfred and I that we were going down to the homestead and she was going to put what she had in the homestead in both our names. She said, ‘Albertha, I want you to have that.’ I said, ‘As long as you are living it’s yours.’ So, we went down to the homestead. It was nine o’clock, and she discussed it with the lady that she wanted it put in both our names, which she had done. And she was well satisfied and we never made nothing over it and that was it.”
Mr. Meyer testified Miss Miller consulted him for advice on her business affairs and gave the following testimony:
“Q Was it your understanding that Mildred would get whatever interest accrued on this savings account in the homestead?
A Mildred used to get the interest, that’s correct.
Q She also got the coupons from the bonds, is that correct?
A That’s correct.
Q And was it also your understanding that if Mildred ever asked for her money back, for whatever reason, that your wife would give her the money back and wouldn’t insist upon the finality of the donation?
A If Mildred wanted her money back, she would get her money back.”
Testimony relied upon by appellants to substantiate her claim for a donation inter vivos of the homestead funds allegedly took place on May 24, the day preceding Miss Miller’s death. At that time Mrs. Meyer testified that Miss Miller told her:
“Q That’s the day before she died?
A Yes, sir.
Q Was she aware of the fact that you were going down and taking the money?
*545 A Sure. When we entered the hospital she told me to go down and get the money out the homestead, and I said, ‘Oh, Mildred, that ain’t necessary. You are not — .’ She said, ‘Al-bertha, I am going to die.’ I said, ‘Don’t tell me that. You are not going to die. You have a long time to live.’ So, near the ending, there, I went down. She told me to go down so I went down.
Q And is there any doubt in your mind but that she knew she had given you the money and you were going to take it out the homestead?
A She knew.”
The mental and physical condition of the decedent, as substantiated by hospital records admitted in evidence casts doubt upon this testimony. These records note that from the time of her admission on May 19, 1976 until her death on May 25, 1976 Miss Miller was in a comatose or semicomatose state and unable to speak or be understood. LSA-R.S. 13:3714 provides that such records shall be accepted as “prima facie proof” of their contents.
Even accepting the testimony of the Meyers as given, the words of Miss Miller do not indicate clear donative intent to irrevocably and presently divest herself of the $7,599.72 in the savings account.
 A joint account does not automatically transfer ownership of all of the monies in the account to each of those parties. In Broussard v. Broussard, 340 So.2d 1309 (La.1976), the Court explained that as long as monies remained in a joint account, there could be no automatic transfer of ownership. Indeed, the right to monies in such an account is an incorporeal one, and C.C. art. 1536 would apply; i. e., the monies could only be donated by notarial act, as long as they remained in the account.
Appellant has cited the case of Succession of Tebo, 358 So.2d 337 (La.App. 4th Cir. 1978). Tebo is distinguishable from this case because Tebo concerned a check which had been manually given by the decedent and then cashed by the donee before the donor’s death, rendering the donation complete.
Succession of Palermo, 359 So.2d 1040 (La.App. 4th Cir. 1978), however, in both the factual and legal issues involved, is applicable. In that case there was a joint savings account in the names of a husband and wife. The husband had expressed his intent, shortly before he died, to give all of the monies in the account to his wife. Two days before his death, the'wife withdrew all of the funds and claimed ownership. The court ruled that no inter vivos donation took place because there was no delivery as required for a manual gift under C.C. art. 1539. The court said, in effect, that although the incorporeal right to the monies in the account had been converted, by the withdrawal, into the corporeal movable of cash, the decedent would have then had to have had actual physical possession of this cash himself and subsequently have then turned it over to the donee wife to complete a valid manual gift.
It is our opinion that there was no valid inter vivos donation of funds in the savings account.
The evidence does not establish decedent’s intent to presently and irrevocably divest herself of all ownership of the funds and to donate same to Mrs. Meyer. Additionally, there was no manual delivery of the withdrawn cash on the part of the donor, since the decedent never had possession of the withdrawn funds.
The Schwegmann bonds purchased by Miss Miller in her name had never been cashed or redeemed.
Under L.R.S. 10:3-202(1) these bonds could have effectively been transferred by simple delivery. We quote:
“Negotiation is the transfer of an instrument in such form that the transferee becomes a holder. If the instrument is payable to order it is negotiated by delivery with any necessary endorsement; if payable to bearer it is negotiated by delivery.”
In Succession of McCrocklin, 242 La. 404, 137 So.2d 274 (1962), the Supreme Court *546 held bearer paper may be donated manually under C.C. art. 1539 provided the intent to donate coupled with actual delivery is established.
It is not conclusive, in the present case, that delivery actually took place or that donative intent was present. Evidence offered to establish delivery and donative intent is contained in the following testimony of Mrs. Meyer:
“Q Were these bonds in your possession at the time Mildred died?
A Yes.
Q How did they come into your possession?
A Her and I went to get the bonds. After she bought the bonds, she said, ‘Albertha, here are the bonds.’ That’s what she said. She gave me the bonds. So, when the interest time came round, I said, ‘Mildred, the interest, here is the little coupons from the bonds.’ I gave her the coupons all the time and I held the bonds, and that was it.
Q Did you understand the bonds to be yours?
A Yes.
Q Did you believe Mildred understood the bonds to be yours?
A Sure, I know she did.”
We have the testimony of Mrs. Meyer that the bonds were kept at her house, and furthermore, that she returned to Miss Miller the coupons of interest as they came due. We also have the testimony of Mrs. Meyer as stating that Miss Miller kept “a lot of her stuff” at Mrs. Meyer’s home.
Mrs. Meyer also testified that Miss Miller often stayed at her home, that she had a room there, and that she still had access to many of her possessions that she kept there.
All of this renders questionable whether Miss Miller actually divested herself of the bonds at the time that she placed them at the home of Mrs. Meyer. As evidence to the contrary we only have the self-serving testimony of Mrs. Meyer and her husband, which must be weighed as such.
For the foregoing reasons the judgment of the trial court is affirmed.

AFFIRMED.